**IN THE COURT OF APPEALS OF IOWA**

No. 23-0792
Filed August 9, 2023

**IN THE INTEREST OF K.B.,**
**Minor Child,**

**D.H., Mother,**
　　Appellant.

_____


Appeal from the Iowa District Court for Shelby County, Charles D. Fagan,
District Associate Judge.


A mother appeals the termination of her parental rights to her three-year-old son. **AFFIRMED.**


J. Joseph Narmi, Council Bluffs, for appellant mother.

Brenna Bird, Attorney General, and Mary A. Triick (until withdrawal) and
Mackenzie L. Moran, Assistant Attorneys General, for appellee State.

William T. Early, Harlan, attorney and guardian ad litem for minor child.


Considered by Tabor, P.J., and Ahlers and Buller, JJ.

**TABOR, Presiding Judge.**

A mother appeals the termination of her parental rights to K.B., the older of her two children, contending the State did not prove grounds for termination. *See* Iowa Code § 232.116(1) (2023). She also argues that termination is not in K.B.'s best interests. *Id.* § 232.116(2). And she urges that the juvenile court should have preserved their parent-child relationship based on two permissive factors in Iowa Code section 232.116(3). As an alternative to termination, she suggests that K.B. be placed in a guardianship with his maternal grandmother. Driving all of the mother's arguments is the perceived contradiction that she has custody of her younger child, D.W., at her home in Carroll County, but termination proceeded on K.B. in Shelby County.

After our independent review of the record, we find no fault in the juvenile court's ruling.[1] True, at the time of the termination hearing, D.W. had not been removed from parental custody or adjudicated as a child in need of assistance (CINA). But that separate assessment of D.W.'s welfare by the Iowa Department of Health and Human Services does not change the situation with K.B.[2]

---

[1] We review termination decisions de novo. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). We respect the juvenile court's factual findings, especially as to witness credibility, but they do not dictate our result. *In re M.D.*, 921 N.W.2d 229, 232 (Iowa 2018). As petitioner, the State must prove the grounds for termination by clear and convincing evidence. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010).

[2] On the subject of K.B.'s sibling, this juvenile court did not mince words:

> This Court has no idea why the young child [D.W.] has not been removed from her parents' care and if it was in this court's jurisdiction she would have been. This Court firmly believes that the [department] in Carroll County is failing that child and potentially putting her at risk.

## I.     Facts and Prior Proceedings

K.B. was born in December 2019.[3]  When he was sixteen months old, a child protection assessment determined that his mother, Dijana, and her boyfriend used methamphetamine while caring for him.[4]  After Dijana avoided contact with the child protection workers and failed to cooperate with drug testing, the court approved removal of K.B. from her custody in June 2021.  Two months later, the court adjudicated K.B. as a CINA.  He was placed with Dijana's biological mother in Omaha, Nebraska, where he has stayed throughout this case.[5]

Meanwhile, Dijana bounced between her boyfriend's home in Irwin and the home of her adoptive parents in Lake City.  According to the department, she did not maintain contact with Family Centered Service (FCS) providers and failed to complete requested drug screens.  Although she told the department that she completed a substance-abuse evaluation in the spring of 2022, the department could not secure documentation to confirm that claim.  Her biological mother supervised her visits with K.B.

By the summer of 2022, Dijana had moved to Carroll, where she shared an apartment with her boyfriend.  Dijana gave birth to her daughter, D.W., that July.  Umbilical cord testing was positive for marijuana, prompting a founded child abuse assessment for the newborn.  According to the social work case manager in Carroll, the department did not seek to remove D.W. from Dijana's custody

---

[3] According to our record, the child's father is unknown.
[4] The department was also concerned that Dijana had struck her boyfriend in the child's presence.  She admitted the assault but insisted K.B. was not there.
[5] By December 2022, K.B. and his grandmother were splitting time between Omaha and her future residence in Sac City, Iowa.

because she and her boyfriend were cooperating with services. The department approved a supervised visit between K.B. and his baby sister in August 2022.

In early November, Dijana asked for overnight visits with K.B. at her Carroll residence. Instead, the department recommended that she "work up" to such contacts by consistently engaging in scheduled interactions with K.B. and then transitioning to semi-supervised visitation. The department suggested that Dijana engage in at least weekly visits with K.B. to "reestablish the bonds that had been affected by [her] extended absence from his life." The department reports that Dijana tried to visit K.B. once or twice a month. But those visits were brief. The grandmother said it was common for Dijana to briefly interact with K.B. "before appearing to become annoyed with him and leave." For instance, Dijana stayed about twenty minutes when visiting for Christmas, before announcing she was heading out to Walmart. And because he had been out of his mother's custody for so long, K.B. viewed his grandmother as his primary caregiver.

After a year of avoiding drug screens, Dijana showed up for testing in December 2022. But when she realized the test assessed hair follicles, she declined, telling the case manager: "I'm just going to have you move forward with termination to give my mom custody. I would have been fine with taking any other test but I'm not comfortable with them doing a hair test." Later that month, the department received notice that Dijana was unsuccessfully discharged from a substance-abuse treatment program. Reporting that Dijana attended just one session, the provider concluded: "The client didn't seem to give her treatment program a chance." When Dijana did do a hair stat screen in February 2023, she tested positive for methamphetamine. She admitted having relapsed in January.

In the days before the termination hearing, Dijana tested negative for methamphetamine but positive for marijuana.

As for visitation, Dijana started seeing K.B. on "an almost weekly basis" after a permanency hearing in January 2023. Their interactions went well. The case manager noted that K.B. "especially seems to enjoy playing with his baby sister."

But at the April 2023 termination trial, the case manager testified that the department did not recommend unsupervised contact with K.B. because Dijana had not completed substance-abuse treatment nor had she given consistent negative drug screens. The case manager also reiterated that Dijana had not cooperated with the FCS worker.

In May 2023, the juvenile court granted the State's petition to terminate Dijana's parental rights to K.B. under Iowa Code section 232.116(1), paragraphs (d), (e), and (h). She appeals that ruling.

## II.  Analysis

We analyze termination cases in three steps. *D.W.*, 791 N.W.2d at 706–07. First, we decide whether the State proved a ground for termination under section 232.116(1). Second, we apply the best-interests framework in section 232.116(2). *Id.* Third, if that framework supports termination, we consider if any factors in section 232.116(3) should nevertheless preclude it. *Id.*

### A. Statutory Ground

"When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record." *In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012). Today we focus on paragraph (d), which requires proof of these elements:

> (1) The court has previously adjudicated the child to be a [CINA] after finding the child to have been . . . neglected as the result of the acts or omissions of one or both parents . . . .
>
> (2) Subsequent to the [CINA] adjudication, the parents were offered or received services to correct the circumstance which led to the adjudication, and the circumstance continues to exist despite the offer or receipt of services.

Iowa Code § 232.116(1)(d).

While imprecise in her petition on appeal, Dijana appears to argue that the State did not prove that the circumstance leading to K.B.'s adjudication as a CINA continues to exist despite the offer or receipt of services. She acknowledges "some methamphetamine relapses" but insists they do not create a risk to K.B. In her words, the department "has made clear that substance abuse is not an adjudicatory harm to [K.B.], as Dijana has [D.W.] in her care."

In response, the State notes that "the facts and circumstances of the younger child's case are not fully known on this record." That's true. This appeal involves only K.B. And we agree with the juvenile court's determination that despite the offer and receipt of services, the circumstances leading to K.B.'s CINA adjudication still exist. *See A.B.*, 815 N.W.2d at 775 (deferring to juvenile judge, who followed the case from beginning and heard live testimony). Dijana did not cooperate with the FCS worker, did not provide regular drug screens, and did not successfully complete substance-abuse treatment. Her methamphetamine abuse that led to K.B.'s CINA adjudication continues to exist. Accordingly, we affirm termination of the mother's rights under paragraph (d).

### B. Bests Interests

Dijana next raises a best-interests challenge. In considering whether termination is in K.B.'s best interests, we give "primary consideration" to his safety,

"to the best placement for furthering [his] long-term nurturing and growth," and to his "physical, mental, and emotional condition and needs." Iowa Code § 232.116(2).

Dijana asserts that she has a "very strong bond" with K.B.[6] and that she can care for both him and his sister. She contends: "[K.B.] and [D.W.] should be together. It is [in] both of their best interests." Granted, we have recognized that "wherever possible brothers and sisters should be kept together." *In re L.B.T.*, 318 N.W.2d 200, 202 (Iowa 1982). But the preference to keep siblings together is not absolute. *See In re J.E.*, 723 N.W.2d 793, 800 (Iowa 2006). Our ultimate concern is K.B.'s best interests, which are served by maintaining the stable placement with his grandmother.

### C. Permissive Factors/Guardianship

As her third claim, Dijana cites factors in section 232.116(3)(a) and (c) that allow courts to forego termination of parental rights even when the State proves statutory grounds. It is her burden to prove that these permissive factors apply. *In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018).

We turn first to section 232.116(3)(c), which requires the mother to prove by clear and convincing evidence that terminating her rights would be detrimental to the child because of the closeness of their relationship. Dijana contends termination of her parental rights would be "absolutely devastating" to K.B. because of their strong bond. The record does not support her contention. Dijana's visitations with K.B. have been inconsistent and show a lack of patience

---

[6] We will address the closeness of the parent-child relationship under Iowa Code section 232.116(3)(c).

for him and his needs. As the department reported, "[T]he lack of frequent and consistent visitation between [Dijana] and [K.B.] have negatively impacted any parent-child bond which may have existed previously between the two."

We next consider section 232.116(3)(a), which gives the court discretion not to terminate parental rights if a relative has legal custody of the child. Because K.B. is placed with his grandmother, Dijana argues there is no need to terminate her parental rights. The State counters that relative placement is not the same as relative custody. We agree with the State. Because K.B. has been in the legal custody of the department, section 232.116(3)(a) does not apply. *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014) (noting this section did not cover a situation when grandparents were taking care of child but DHS had legal custody).

Finally, we consider Dijana's alternative request to place K.B. in a guardianship with his maternal grandmother. Creating a guardianship is not a "legally preferable alternative" to terminating parental rights. *See In re W.M.*, 957 N.W.2d 305, 315 (Iowa 2021). Yet a guardianship may be appropriate if the parent has a close and conflict-free relationship with the caregiver. *See In re B.T.*, 894 N.W.2d 29, 34 (Iowa Ct. App. 2017). Dijana asserts that K.B.'s situation fits that exception because she and the grandmother both favor guardianship over termination. The grandmother did not testify at the termination hearing, so we are not sure that assertion is true. But even if it were, we find the contemplated adoption by the grandmother is a better and more permanent resolution for K.B.

**AFFIRMED.**